## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JUNJI SHIBATA, derivatively on behalf of LIFEMD, INC., <br><br> Plaintiff, <br><br> vs. <br><br> JUSTIN SCHREIBER, MARC BENATHEN, JOSEPH V. DITROLIO, WILLIAM FEBBO, JOAN LAROVERE, CALUM MACRAE, ROBERTO SIMON, and JOHN STRAWN, <br><br> Defendants, <br><br> and <br><br> LIFEMD, INC., <br><br> Nominal Defendant. | Case No.: 2:25-cv-05284 <br><br><br> **DEMAND FOR JURY TRIAL** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Junji Shibata ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant LifeMD, Inc. ("LifeMD" or the "Company"), files this Verified Shareholder Derivative Complaint against Justin Schreiber ("Schreiber"), Marc Benathen ("Benathen"), Joseph V. DiTrolio ("DiTrolio"), William Febbo ("Febbo"), Joan LaRovere ("LaRovere"), Calum MacRae ("MacRae"), Roberto Simon ("Simon"), and John Strawn ("Strawn") (collectively, the "Individual Defendants," and together with LifeMD, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of LifeMD, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, , for violations of Sections 14(a) of Securities Exchange Act of 1934 (the "Exchange Act"), as well as for

1

contribution under Sections 10(b) and 21D of the Exchange Act. As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by the Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding LifeMD, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by LifeMD's directors and officers from May 7, 2025 through August 5, 2025, inclusive (the "Relevant Period").

2.      LifeMD is a telehealth company that offers a variety of services to patients, including doctor consultations, laboratory and pharmacy services, hormone therapy, and specialized treatment.

3.      LifeMD entered the men's telehealth market by launching the RexMD brand. RexMD allows patients to have access to GLP-1 weight loss medications such as Wegovy and Zepbound, without the need to visit a doctor in person.

4.      During the Relevant Period, the Company overstated RexMD's position in the market and failed to account for possible headwinds in its sales of GLP-1 medications. For example, in a press release titled "LifeMD Reports First Quarter 2025 Results and Raises Full-

Year Guidance" (the "1Q 2025 Earnings Press Release"), the Company touted its performance in

the GLP-1 market, stating in relevant part,

> Our recently announced strategic collaborations with both LillyDirect and NovoCare continue to generate momentum by allowing us to offer more convenient and affordable access to branded GLP-1 medications. These collaborations make LifeMD the only telehealth provider in the U.S. that offers synchronous care and cash-pay access to both Wegovy® and Zepbound®. In addition to the continued success of our existing telehealth platforms, we recently announced key hires in the mental and hormonal health verticals and the acquisition of important assets in behavioral health and women's health. These are two strategic areas with significant unmet clinical need in the marketplace and within our existing patient population.

5.     The truth emerged on August 5, 2025, when the Company issued a press release

titled "LifeMD Reports Second Quarter Results" (the "2Q 2025 Earnings Press Release"). The 2Q

2025 Earnings Press Release revealed the Company was experiencing headwinds in the GLP-1

market and increased customer acquisition costs for RexMD. As a result of these headwinds, the

Company lowered its guidance for the rest of the year.

6.     On this news, the price of the Company's stock fell $5.31 per share, or

approximately 44.8%, from a close of $11.84 per share on August 5, 2024, to close at $6.53 per

share on August 6, 2024.

7.     Throughout the Relevant Period, the Defendants made materially false and

misleading statements and failed to disclose material adverse facts about LifeMD's business,

operations, and prospects. In particular, the Individual Defendants failed to disclose to

shareholders and investors that: (1) the Individual Defendants were reckless raising its guidance

in the 1Q 2025 Earnings Press Release because they had not accounted for possible headwinds in

the GLP-1 market and RexMD; (2) as a result, the heightened guidance in the 1Q 2025 Earnings

Press Release was not "conservative" as stated in a subsequent earnings call; and (3) as a result,

the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

8.      The Individual Defendants also breached their fiduciary duties by failing to correct and/or causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

9.      In addition, during the Relevant Period, the Individual Defendants breached their fiduciary duties by failing to maintain adequate internal controls while Defendants Scheiber and Benathen engaged in improper insider sales, netting total proceeds of *approximately $2.6 million*.

10.     In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to a federal securities fraud class action lawsuits pending in the United States District Court for the Eastern District of New York (the "Securities Class Action"), the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses due to the repurchases discussed in the previous paragraph, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

11.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of the officers' and directors' liability in the Securities Class Action, and of

their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9, Section 10(b) of the Exchange Act (15 U.S.C. § 78j(b)), and Section 21D of the Exchange Act (15 U.S.C. §78u-4(f)), and raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

13.     Additionally, diversity jurisdiction is conferred by 28 U.S.C. § 1332. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

14.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

15.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

16.     Venue is proper in this District because the alleged misstatements and wrongs complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

17.     Plaintiff is a current shareholder of LifeMD. Plaintiff has continuously held shares of LifeMD common stock at all relevant times.

**Nominal Defendant LifeMD**

18.     LifeMD is a Delaware corporation with principal executive offices at 256 Fifth Avenue, Suite 400 New York, New York 10001. LifeMD common stock trades on the Nasdaq Global Market ("NASDAQ") under the ticker symbol "LFMD."

**Defendant Schreiber**

19.     Defendant Schreiber has served as a Company director since 2018 and as Chairman of the Board since 2019. Previously, Defendant Schreiber served as the Company's President from 2018 until 2021.

20.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Schreiber made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|---|---|---|---|
| June 2, 2025 | 25,000 | $12.47 | $311,750 |
| July 1, 2025 | 25,000 | $13.38 | $334,450 |
| July 1, 2025 | 25,000 | $9.99 | $249,750 |

Thus, in total, before the fraud was exposed, Defendant Schreiber sold 75,000 shares of Company stock on inside information, for which he received approximately $895,950 in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

21.     The proxy statement LifeMD filed with the SEC via a Schedule 14A on April 28, 2025 (the "2025 Proxy Statement"), stated the following about Defendant Schreiber:

Mr. Schreiber has served as Chairman of the Board since 2019 and Chief Executive Officer of the Company since 2022. He joined the Board in 2018, and he was

formerly President of the Company from 2018 to 2021. Mr. Schreiber has also served as President of LifeMD PR, LLC, the Company's wholly-owned subsidiary in Puerto Rico ("LifeMD PR"), since 2017. Mr. Schreiber is the President and founder of JLS Ventures, an investment firm focused on venture and growth stage businesses in the healthcare and technology sectors. Prior to founding JLS Ventures, Mr. Schreiber ran a consulting business that provided investor relations, advisory services, and capital raising solutions to small publicly traded companies. In addition to his capital markets experience, Mr. Schreiber previously worked for a global healthcare consulting firm as well as in the foreign currency trading business. He holds a BS in International Business from Elizabethtown College and a BA in International Management from the ICN École de management in Nancy, France.

**Defendant Benathen**

22.     Defendant Benathen has served as the Company's CFO since 2021.

23.     During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Benathen made the following sales of Company common stock:

| Date | Number of Shares | Avg. Price/ Share ($) | Proceeds ($) |
|------|------------------|------------------------|--------------|
| June 16, 2025 | 75,000 | $13.09 | $981,750 |
| June 17, 2025 | 50,000 | $14.01 | $700,500 |

Thus, in total, before the fraud was exposed, Defendant Benathen sold 125,000 shares of Company stock on inside information, for which he received approximately $1.7 million in total proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

24.     The 2025 Proxy Statement states the following about Defendant Benathen:

Marc Benathen was appointed Chief Financial Officer of the Company in 2021. Mr. Benathen combines over 18 years of experience in financial, operational, and consumer products/services senior management. Previously, he had been involved in six companies in the consumer, technology, and media industries holding

positions including Chief Financial Officer, Vice President and Director. From 2017 through 2021, Mr. Benathen was the Chief Financial Officer for Blink Holdings, Inc. (dba Blink Fitness), a national fitness company. From 2014 to 2017, he was Vice President of Finance for Blink Fitness. From December 2010 to January 2014, he was Senior Manager of Corporate Finance of ANN, Inc., a NYSE-listed retail company that focused on women's fashion. Mr. Benathen is also currently a director of Baruch College Alumni Association and past Trustee of the Baruch College Fund, a charitable and alumni arm of Baruch College. He has an undergraduate degree from Baruch College with Honors.

**Defendant DiTrolio**

25.     Defendant DiTrolio served as Company director since 2014. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee.

26.     The 2025 Proxy Statement states the following about Defendant DiTrolio:

Dr. DiTrolio was appointed to our Board of Directors in 2014. Dr. DiTrolio is recognized world-wide as an inventor, researcher, and lecturer. He is the holder of several patents and has been a Clinical Professor of Surgery, Division of Urology at New Jersey Medical School, since 1985, and the recent past Chairman of the Department of Urology for the St. Barnabas Medical Center Healthcare System. He is a graduate of the University of Richmond, University of Paris, Sorbonne, and New Jersey Medical School. He is a Diplomate of the American Board of Urology and is well respected in the urology community for innovative techniques and product development.

Dr. DiTrolio contributes medical expertise developed over his long career, particularly as a specialist and academic in the field of urology, an understanding of trends in medical innovation and research, and an intimate knowledge of our operations.

**Defendant Febbo**

27.     Defendant Febbo served as a Company director since 2017.

28.     The 2025 Proxy Statement states the following about Defendant Febbo:

Mr. Febbo was appointed to our Board of Directors in 2023. Mr. Febbo served as Chief Executive Officer of OptimizeRx from 2015 to 2024. Mr. Febbo founded Plexuus, LLC, a payment processing business for medical professionals in 2015 and remained its Chairman from 2015 to 2020. From 2007 to 2015, Mr. Febbo served as Chief Operating Officer of Merriman Holdings, Inc., an investment banking firm, where he assisted with capital raises in the tech, biotech, cleantech,

consumer and resources industries. Mr. Febbo was a co-founder of, and from 1999 to 2015 was Chief Executive Officer of, MedPanel, LLC, a provider of market intelligence and communications for the pharmaceutical, biomedical, and medical device industries. Since 2017, Mr. Febbo has been a mentor and faculty member of the Massachusetts Institute of Technology's linQ program, which is a collaborative initiative focused on increasing the potential of innovative research to benefit society and the economy. In addition, since 2021, Mr. Febbo has been a board member of the Baldwin School of Puerto Rico and Performance Health Systems (Private).

Mr. Febbo contributes more than 30 years of experience in building and managing health services and financial businesses. In addition, Mr. Febbo's leadership of OptimizerRx's business provides the Board with invaluable insight into the Company's operations and strategic direction.

Mr. Febbo served as a director of OptimizeRx (Nasdaq: OPRX) from 2015 to 2024.

**Defendant LaRovere**

29.     Defendant LaRovere has served as a Company director since 2023. She also serves as a member of the Audit Committee.

30.     The 2025 Proxy Statement states the following about Defendant LaRovere:

Dr. LaRovere was appointed to our Board of Directors in 2023. Dr. LaRovere is a Co-Founder and Vice President of Virtue Foundation, founded in 2002, as a non-profit organization with Special Consultative Status to the United Nations whose mission is to increase awareness, inspire action and render assistance through healthcare, education, and empowerment initiatives. She currently serves on the board of directors of Virtue Foundation. She has served as an Assistant Professor of Pediatrics at Harvard Medical School since 2011 and has served as Director of Innovation and Outcomes and a Senior Staff Physician at Cardiac Intensive Care at Boston Children's Hospital since 2011. Dr. LaRovere has been a Professional Advisor to the Martin Trust Center for MIT Entrepreneurship and is on the board of directors of the Delta V Summer Accelerator Program since 2016. She also serves as a Healthcare Operating Partner for iSelect Fund, a venture firm which invests in companies addressing critical global issues, in food, health and nutrition, since 2021. Previously, Dr. LaRovere served as Chief of the Pediatric Intensive Care Unit for The Royal Brompton Hospital, a part of Imperial College School of Medicine in London, from 1999 to 2011. She also served as a Consulting Physician to Bupa Cromwell Hospital from 2000 to 2011. Dr. LaRovere holds a Bachelor of Arts in Visual and Environmental Studies from Harvard University, a Master of Science in Genetics from the University of St. Andrews, a Doctorate of Medicine from Columbia University Vagelos College of Physicians and Surgeons, and a Master of Business Administration from the MIT Sloan School of Management.

Dr. LaRovere contributes extensive experience in medicine and innovation based on her roles as a physician, academic, and executive advising emerging companies.

**Defendant MacRae**

31.     Defendant MacRae has served as a Company director since 2024.

32.     The 2025 Proxy Statement states the following about Defendant MacRae:

Dr. MacRae was appointed to our Board of Directors in April 2024. He has served as the Vice Chair for Scientific Innovation of the Department of Medicine of Brigham and Women's Hospital, now a part of MassGeneral Brigham, since 2018, and as Chief of Cardiovascular Medicine at the Hospital from 2014 to 2018. Dr. MacRae has served on the faculty of Harvard Medical School since 2002. Since 2017, Dr. MacRae has been the director of One Brave Idea, a group of leading scientists from multiple disciplines working together to understand the earliest stages of coronary heart disease and other forms of chronic disease. He is also the Principal Investigator of the Apple Health Study. Dr. MacRae is a Co-Founder and director of Atman Health Inc. since 2021 and a Co-Founder of Tanaist Inc since 2025. Dr. MacRae has also served as Head of Innovation and a director of TMA Precision Health, Inc. since 2024. Dr. MacRae received his Bachelors of Science and Doctorate of Medicine from the University of Edinburgh and his Doctorate of Human Molecular Genetics from the University of London.

Dr. MacRae contributes considerable experience in medical research and innovation, particularly in the areas of genomics in medicine, disease modeling, developmental biology, drug discovery, systematic approaches to discovering new phenotypes, and the role of disruptive innovation in refashioning the clinical-translational interface.

**Defendant Simon**

33.     Defendant Simon has served as a Company director since 2020. He also serves as Chairman of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee and the Audit Committee.

34.     The 2025 Proxy Statement states the following about Defendant Simon:

Mr. Simon was appointed to our Board of Directors in 2020. Mr. Simon has served as Chief Financial Officer of Orveon LLC, a global beauty care and cosmetics company since August 2024. Mr. Simon served as Chief Financial Officer of Norstella, a global leader in end-to-end solutions that smooth access to life-saving

therapies for patients, from 2022 to 2024. Mr. Simon served as Chief Financial Officer of WEX Inc., a leading financial technology service provider, from 2016 to 2022. Previously, Mr. Simon served as the Executive Vice President and Chief Financial Officer of Revlon, Inc., a global cosmetic, personal and beauty care products company, from 2014 until 2016. Prior to that, he was the Revlon Senior Vice President, Global Finance from 2013 to 2014 and served as Revlon's Global Business Process Owner, SAP, from February 2014 until September 2014. Prior to joining Revlon as a result of Revlon's acquisition of The Colomer Group Participations, S.L., a Spain-based salon and professional beauty business, Mr. Simon served in various senior finance positions of increasing responsibility at The Colomer Group since 2002, including most recently serving as The Colomer Group's Chief Financial Officer from 2011 to 2014. Prior to that, he served as The Colomer Group's Vice President of Finance for America and Africa from 2008 until 2011.

Mr. Simon contributes to Board discussions on capital allocation as well as financial reporting, planning, and budgeting based on his experience in overseeing finance functions for complex, multinational businesses. Additionally, Mr. Simon contributes to the Board of Directors and Audit Committee discussions on Sarbanes-Oxley controls as the Company continues its Sarbanes-Oxley implementation and on compensation matters for the executive team.

**Defendant Strawn**

35.    Defendant Strawn has served as a Company director since 2011. He also serves as the Chairman of the Compensation Committee and the Nominating and Corporate Governance Committee and as a member of the Audit Committee.

36.    The 2025 Proxy Statement states the following about Defendant Strawn:

Mr. Strawn was appointed to our Board of Directors in 2011. In 2010, Mr. Strawn became a founding partner of the law firm of Strawn Pickens LLP ("Strawn Pickens"), a Chambers ranked dispute resolution firm, in Houston, Texas. Mr. Strawn has served as the managing partner of Strawn Pickens for the past fifteen years, representing clients in litigation, arbitrations, and various legal matters. Prior to founding Strawn Pickens, Mr. Strawn was the Co-Managing Partner of Cruse Scott Henderson & Allen LLP, a law firm based in Houston, Texas, since 1992. Prior to that, Mr. Strawn was an attorney with Andrews & Kurth LLP. Mr. Strawn's professional recognitions include Board Certification in Civil Trial Law, membership in the American Board of Trial Advocates and International Society of Barristers, as well as Life Fellow of Texas Bar Foundation and Houston Bar Foundation, AV Rated by Martindale-Hubbell and a Texas "Super Lawyer" since 2005. Mr. Strawn received his Juris Doctor with Honors from the University of Texas Law School and his bachelor's degree cum laude from Dartmouth College.

Mr. Strawn brings to the Board of Directors over 35 years of legal experience, including extensive knowledge of our intellectual property portfolio. His practice focuses on complex commercial litigation including contract, employment, insurance and intellectual property matters.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

37.     By reason of their positions as officers, directors, and/or fiduciaries of LifeMD and because of their ability to control the business and corporate affairs of LifeMD, the Individual Defendants owed LifeMD and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage LifeMD in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of LifeMD and its shareholders so as to benefit all shareholders equally.

38.     Each director and officer of the Company owes to LifeMD and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of LifeMD, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

40.     To discharge their duties, the officers and directors of LifeMD were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

41.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the

affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of LifeMD, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised LifeMD's Board at all relevant times.

42.     As senior executive officers and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

43.     To discharge their duties, the officers and directors of LifeMD were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of LifeMD were required to, among other things:

(a)    ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, New York, and the United States;

(b)    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)    remain informed as to how LifeMD conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of LifeMD and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that LifeMD's operations would comply with all applicable laws and LifeMD's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)    exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)    refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

14

(h)    examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

44.    Each of the Individual Defendants further owed to LifeMD and the shareholders the duty of loyalty requiring that each favor LifeMD's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

45.    At all times relevant hereto, the Individual Defendants were the agents of each other and of LifeMD and were at all times acting within the course and scope of such agency.

46.    Because of their advisory, executive, managerial, directorial, and controlling positions with LifeMD, each of the Individual Defendants had access to adverse, non-public information about the Company.

47.    The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by LifeMD.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

48.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

49.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants'

violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

50.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants who is a director of LifeMD was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted in the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

52.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of LifeMD and was at all times acting within the course and scope of such agency.

## AUDIT COMMITTEE CHARTER

53.     The Company also maintains the "Charter of the Audit Committee of the Board of

Directors" (the "Audit Committee Charter"). Under a section titled "Audit Committee Purpose,"

the Audit Committee Charter states the following:

> The purpose of the Audit Committee (the "Committee") of the Board of Directors
> (the "Board") of LifeMD, Inc. ("LFMD" or the "Company") is to oversee the
> processes of accounting and financial reporting of the Company and the audits and
> financial statements of the Company. The Committee's primary duties and
> responsibilities are to:
>
>> A. Monitor the integrity of the Company's financial reporting process and
>> systems of internal controls regarding finance, accounting and legal
>> compliance.
>> B. Monitor the independence and performance of the Company's
>> independent auditors and the Company's accounting personnel.
>> C. Provide an avenue of communication among the independent auditors,
>> management, the Company's accounting personnel, and the Board.
>> D. Appoint and provide oversight for the independent auditors engaged to
>> perform the audit of the financial statements.
>> E. Discuss the scope of the independent auditors' examination.
>> F. Review the financial statements and the independent auditors' report.
>> G. Review areas of potential significant financial risk to the Company.
>> H. Monitor compliance with legal and regulatory requirements.
>> I. Solicit recommendations from the independent auditors regarding internal
>> controls and other matters.
>> J. Make recommendations to the Board.
>> K. Resolve any disagreements between management and the auditors
>> regarding financial reporting.
>> L. Prepare the report required by Item 407(d) of Regulation S-K, as required
>> by the rules of the Securities and Exchange Commission (the "SEC").
>> M. Perform other related tasks as requested by the Board.
>
> The committee has the authority to conduct any investigation appropriate to
> fulfilling its responsibilities, and it has direct access to the independent auditors as
> well as anyone in the organization. The Committee has the ability to retain, at the
> Company's expense, special legal, accounting, or other consultants or experts it
> deems necessary in the performance of its duties.

54.     Under a section titled "Audit Committee Responsibilities and Duties," in a

subsection titled "Review Procedures," the Audit Committee Charter states the following:

A. Review the Company's annual audited financial statements prior to distribution. Review should include discussion with management and independent auditors of significant issues regarding accounting principles, practices, and judgments.

B. In consultation with the management, the independent auditors, and the Company's principal accounting officer, consider the integrity of the Company's financial reporting processes and controls, including any major issues as to the adequacy of the Company's internal controls, and any special steps adopted in light of any identified material control deficiencies. Discuss significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures. Review significant findings prepared by the independent auditors and the Company's principal accounting officer together with management's responses.

C. The Committee shall review with the management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies.

55.    In the same section, in a subsection titled "Accounting Department and Legal Compliance," the Audit Committee Charter states:

The Committee shall:

A. Review the personnel activities and qualifications of the Company's accounting personnel, as needed.
B. Review the appointment and performance of the principal accounting officer, and review financial and accounting personnel succession planning with the Company.
C. Review significant reports prepared by the Company's principal accounting officer together with management's response and follow-up to these reports.
D. On at least an annual basis, review with the Company's counsel any legal matters that could have a significant impact on the Company's financial statements, the Company's compliance with applicable laws and regulations, and inquiries received from regulators or governmental agencies.
E. Establish procedures for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.
F. The Committee shall review the CEO and CFO's disclosure and certifications under Sections 302 and 906 of the Sarbanes-Oxley Act.
G. Conduct an appropriate review of and approve all related party transactions on an ongoing basis and the Committee shall review potential conflict of interest situations where appropriate.

H. Conduct an annual risk review with respect to the matters within the role and the responsibilities of the Committee.

The Committee shall:

(a) Report regularly to the Board on its activities;
(b) Maintain minutes of its meetings and records relating to those meetings and the Committee's activities;
(c) Have authority to obtain, at the expense of the Company, advice and assistance from internal or external legal, consulting or other advisors;
(d) Form and delegate authority to subcommittees of one or more Committee members when desired and appropriate;
(e) Review and reassess the adequacy of this Charter annually and recommend to the Board any proposed changes to this Charter; and
(f) Periodically review the Committee's own performance.

56.    In the same section, in a subsection titled "General," the Audit Committee Charter states:

In performing their responsibilities, Committee members are entitled to rely in good faith on information, opinions, reports or statements prepared or presented by:

(a) One of more officers or employees of the Company whom the Committee member reasonably believes to be reliable and competent in the matters presented;
(b) Counsel, independent auditors, or other persons as to matters which the Committee member reasonably believes to be within the professional or expert competence of such person; and
(c) Other committees of the Board as to matters within their respective designated authority which the Committee member reasonably believes to merit confidence.

The Committee has the powers and responsibilities delineated in this Charter. It is not, however, the Committee's responsibility to prepare and certify the Company's financial statements, to guarantee the independent auditor's report, or to guarantee other disclosures by the Company. These are fundamental responsibilities of management and the independent auditor. Committee members are not full-time Company employees and are not performing the functions of auditors or accountants.

57.    In violation of the Audit Committee Charter, Defendants Simon, LaRovere, and Strawn failed to adequately review and discuss the Company's quarterly earnings press releases; failed to adequately exercise their risk management and risk assessment functions; and failed to

ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures.

## THE INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Relevant Background*

58.     LifeMD is a telehealth company that offers a variety of services to patients, including doctor consultations, laboratory and pharmacy services, hormone therapy, and specialized treatment.

59.     LifeMD entered the men's telehealth market by launching the RexMD brand. RexMD allows patients to have access to GLP-1 weight loss medications such as Wegovy and Zepbound, without the need to visit a doctor in person.

## False and Misleading Statements

60.     On April 28, 2025, Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn solicited the 2025 Proxy Statement, filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.

61.     The 2025 Proxy Statement called for shareholder approval of, inter alia: (1) the re-election of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn to the Board; and (2) to ratify the selection of CBIZ CPAs, P.C. as the Company's independent registered public accounting firm for the fiscal year ending December 31, 2025.

62.     With respect to the "Board Leadership Structure and Role in Risk Oversight," the 2025 Proxy Statement stated:

> Justin Schreiber serves as both the Chairman of our Board and our Chief Executive Officer. We believe having a single person serve as both Chair of our Board and our Chief Executive Officer is the most effective leadership structure for us at this time.
>
> As Chairman of the Board, Mr. Schreiber's key responsibilities include facilitating communication between our Board and management; assessing management's

performance; managing board members; preparation of the agenda for each board meeting; acting as Chairman of board meetings and meetings of our Company's stockholders; and managing relations with stockholders, other stakeholders, and the public.

Our Board does not currently have a designated lead independent director. We are aware of the potential conflicts that may arise when an interested director is Chairman of the Board, but we take steps to ensure that adequate structures and processes are in place to permit our Board to function independently of management. For example, the directors are able to request at any time a meeting restricted to independent directors for the purposes of discussing matters independently of management and are encouraged to do so should they feel that such a meeting is required.

The Board will continue to exercise its judgment on an ongoing basis to determine the optimal Board leadership structure that the Board believes will provide effective leadership, oversight, and direction, while optimizing the functioning of both the Board and management and facilitating effective communication between the two. The Board may modify its leadership structure in the future as it deems appropriate. Risk assessment and oversight are an integral part of our governance and management processes. Our management is responsible for our day-to-day risk management activities. Our Audit Committee is responsible for overseeing our risk management process. Our Audit Committee focuses on our general risk management policies and strategy, and the most significant risks facing us, including cybersecurity, and oversees the implementation of risk mitigation strategies by management. Our Compensation Committee is responsible for overseeing risks related to our compensation programs. Our Nominating and Corporate Governance Committee is responsible for overseeing risks related to our corporate governance policies and practices. Our Board is also apprised of particular risk management matters in connection with its general oversight role, including approval of corporate matters and significant transactions.

63.    With respect to the "Audit Committee," the 2025 Proxy Statement stated:

The Audit Committee oversees our accounting and financial reporting processes and oversee the audit of our consolidated financial statements and the effectiveness of our internal control over financial reporting. The specific functions of this Committee include, but are not limited to:

- The appointment of an independent registered public accounting firm and overseeing the engagement of such firm;
- Approving the fees to be paid to the independent registered public accounting firm;
- Helping ensure the independence of the independent registered public accounting firm;
- Overseeing the integrity of our financial statements;

- Preparing an audit committee report as required by the SEC to be included in our annual proxy statement;
- Resolving any disagreements between management and the auditors regarding financial reporting;
- Reviewing with management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies;
- Reviewing and approving all related-party transactions; and
- Overseeing compliance with legal and regulatory requirements

64.    Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn caused the 2025 Proxy Statement to be false and misleading because: (1) the Board and its committee's were not exercising adequate risk judgement when raising 1Q 2025 guidance because they had not properly accounted for possible headwinds in the men's health and GLP-1 sectors; and (2) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and misleading at all relevant times.

65.    As a result of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn to the Board causing the 2025 Proxy Statement to be false and misleading, Company shareholders voted, *inter alia*, to: (1)  re-elect of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of CBIZ CPAs, P.C. as the Company's independent registered public accounting firm for the fiscal year ending on December 31, 2025.

### *1Q 2025 Financial Reports*

66.    On May 6, 2025, LifeMD issued the 1Q 2025 Earnings Press Release. In the 1Q 2025 Earnings Press Release, Defendant Schreiber stated:

LifeMD had an outstanding first quarter that demonstrated the power of our platform, the need for our services and the accelerated growth trajectory of the business as we achieved our first-ever quarter of GAAP profitability well ahead of expectations. ***During the quarter we expanded across all service areas, and the***

*performance of our weight management program underscored our success as it is now expected to exceed top- and bottom-line expectations for the full year.*[1] The launch of our men's hormone therapy offering, and recent acceptance of Medicare are also off to strong starts and continue to diversify our already leading telehealth platform.

*Our recently announced strategic collaborations with both LillyDirect and NovoCare continue to generate momentum by allowing us to offer more convenient and affordable access to branded GLP-1 medications. These collaborations make LifeMD the only telehealth provider in the U.S. that offers synchronous care and cash-pay access to both Wegovy® and Zepbound®.* In addition to the continued success of our existing telehealth platforms, we recently announced key hires in the mental and hormonal health verticals and the acquisition of important assets in behavioral health and women's health. These are two strategic areas with significant unmet clinical need in the marketplace and within our existing patient population.

67.    Due to the Company's purportedly strong first quarter, Defendant Benathen announced LifeMD was raising its full-year guidance, stating:

LifeMD had an exceptionally strong first quarter with top- and bottom-line growth both ahead of our expectations. Telehealth revenue achieved 70% year-over-year growth on a standalone basis, while our telehealth adjusted EBITDA increased to $5.3 million from a loss of $1.3 million in the year-ago period. We also achieved positive GAAP net income for the first time[.] *We are raising our full-year 2025 guidance to reflect our strong performance to date for both revenue and adjusted EBITDA. We now expect total revenues in the range of $268 to $275 million, up from $265 to $275 million, and adjusted EBITDA in the range of $31 to $33 million, up from $30 to $32 million.*

68.    The 1Q 2025 Earnings Press Release further detailed its updated guidance, stating:

For the full year 2025, due to the outperformance of its telehealth business in the first quarter the Company is raising its previous guidance to:

- Total revenues in the range of $268 million to $275 million, up from previous guidance of $265 million to $275 million.
- Telehealth revenue in the range of $208 million to $213 million, up from $205 million to $213 million.
- Adjusted EBITDA in the range of $31 million to $33 million, up from $30 million to $32 million.
- Telehealth adjusted EBITDA is now forecast to exceed $21 million, up from approximately $20 million previously.

---

[1] All emphasis has been added unless otherwise stated.

69.    Later the same day, the Company held an earnings call discussing its first quarter 2025 financial results (the "1Q 2025 Earnings Call"). On the 1Q 2025 Earnings Call, Defendant Benathen reiterated the Company's updated guidance was due to LifeMD's "outperformance of our Telehealth business to-date."

70.    On the 1Q 2025 Earnings Call, Defendant Schreiber continued to tout the growth of the RexMD brand, stating in relevant part:

> Now I'll turn to our virtual primary care platform. As recently announced, we've established strategic collaborations with LillyDirect and NovoCare to improve access to GLP-1 medications for weight management patients without insurance coverage. These partnerships reflect the growing recognition of our patient-first model and underscore our ability to streamline access to transformative therapies.
>
> LifeMD is now the only virtual care provider offering synchronous consults integrated with both NovoCare and LillyDirect, enabling seamless access to Wegovy and Zepbound. ***Combined with our direct-to-patient pharmacy, specialized nationwide provider network and pharmacy benefits infrastructure, we believe we've created a category-defining competitive moat in virtual obesity care***. It's worth noting that we expect to do exactly the same thing in many other verticals in the years to come.
>
> ***
>
> ***Our RexMD brand continues to perform exceptionally well, with consistent growth in both revenue and active patient count***, further reinforcing its position as a category leader in men's health.
>
> As we previously guided, we continue to expand Rex beyond its original focus on sexual health into larger, high-demand verticals, including weight management, behavioral health, insomnia and hormone replacement therapy.
>
> Our newly launched HRT program is off to a strong start with early adoption, exceeding expectations and offering valuable insights into this fast-growing category. Notably, more than 40% of new HRT patients are existing RexMD patients already engaged in another care subscription.
>
> ***Later this year, we plan to introduce LifeMDPlus and other synchronous care offerings to RexMD's 180,000 active patients, unlocking a significant cross-care opportunity across our ecosystem.***

*** 

*As we conclude our prepared remarks, I want to underscore how energized we are by LifeMD's strong start to 2025.* Our first quarter performance reflects disciplined execution against our strategic priorities and the early traction we're seeing across key initiatives gives us strong confidence in our trajectory for the remainder of the year.

The programs we've launched, including the expansion of our benefits infrastructure, strategic collaborations with GLP-1 manufacturers, new RexMD offerings, and our entry into the women's and behavioral health space are all aligned with our near-term vision to build a trusted, vertically integrated marketplace for healthcare services, prescription medications and over-the-counter healthcare products.

71.    The question-and-answer portion of the 1Q 2025 Earnings Call included the following exchange discussing the possibility of any headwinds LifeMD could face through the rest of the year:

Analyst: Hi. Congrats on the great quarter and thank you for taking the questions. So first just looking at your guidance for Telehealth, like raising the lower end for revenues following a strong quarter. This looks like you're spending Telehealth to be roughly flat sequentially. *Is this just being conservative or there's some headwinds that you're anticipating that will limit your ability to grow sequentially.*

Defendant Benathen: Yeah. No. It's not that there's headwinds. I mean there's some timing in the revenue that we have. I mean, *we tend to take a relatively conservative view to revenue.* We do normally expect and see that aspects of the Rex business and sexual health tend to be a little bit softer seasonally in Q2 than they are in Q1, which is what historically we've seen, particularly from new acquisition standpoints. We've baked that into our model also. But all that's pretty consistent with what we've seen in the past. Obviously, there's tremendous growth year-on-year and that's essentially how we're managing the business versus just managing for sequential growth every single quarter.

72.    The statements contained in ¶66-71 were materially false and misleading, because *inter alia*, (1) the Individual Defendants were reckless raising its guidance in the 1Q 2025 Earnings Press Release because they had not accounted for possible headwinds in the GLP-1 market and RexMD; and (2) as a result, the heightened guidance in the 1Q 2025 Earnings Press Release was

not "conservative" as stated in a subsequent earnings call. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### The Truth Emerges

73.     On August 5, 2025, the Company issued the 2Q 2025 Earnings Press Release. In the 2Q 2025 Earnings Press Release, Defendant Benathen revealed that as a result of some "largely resolved" temporary challenges facing RexMD, the Company was "***revising our full year 2025 guidance for revenue and adjusted EBITDA to reflect the full-year impact of these issues***, while still anticipating strong year-over-year growth in both metrics."

74.     The 2Q 2025 Earnings Press Release detailed the updated guidance, stating:

- Total revenue in the range of ***$250 million to $255 million, compared with the previous guidance of $268 million to $275 million.***
- Telehealth revenue in the range of ***$195 million to $200 million, compared with $208 million to $213 million previously***.
- Adjusted EBITDA in the range of ***$27 million to $29 million, compared with $31 million to $33 million previously.***
- Telehealth adjusted ***EBITDA is now forecast to be in the range of $14 million to $16 million, down from $21 million previously***.

75.     Later the same day, the Company held earnings call discussing its second quarter 2025 financial results (the "2Q 2025 Earnings Call"). On the 2Q 2025 Earnings Call, Defendant Schreiber stated "***we weren't satisfied with our overall performance***," and further stated:

> Our weight management business remains robust, consistently attracting over 400 new patient sign-ups per day. Notably, we've seen a significant increase in patients accessing branded therapy options through our platform. Given current trends and the improvements we expect to see in pricing and insurance coverage, we expect that by year-end, the vast majority of new patients will be on an insurance covered GLP-1 therapy, an affordable cash-based therapy or one of our oral prescription therapies for weight loss.
>
> ***We continue to invest in improving the care platform that supports our weight management program***. This decision is validated by the fact that we are seeing a growing number of weight management patients using our platform to access

nonweight-related health care services and products. *While our weight management segment did outperform our second quarter guidance plan for this segment, weight management has been impacted by a higher-than-anticipated refund rate driven by patients either lacking insurance coverage for their medications or being unable to afford the out-of-pocket cost of branded therapies*.

Although this is a near-term headwind, we are actively enhancing our new patient intake process to include real-time benefit verification and other key improvements. These updates are designed to significantly improve the patient experience and drive higher conversion rates on to therapy. As part of these efforts, we are expanding access to a broader range of oral generic weight loss medications and adding liraglutide as a covered option. We remain highly confident in the long-term opportunity within prescription weight management. This is a large and underserved market, and we believe the steps we're taking will further strengthen our leadership position despite the temporary challenges.

***

*Turning to Rex. We experienced a challenging second quarter, primarily due to temporarily elevated customer acquisition costs in the highly competitive ED market.* However, we have since adjusted our marketing and product strategies and early third quarter data suggests a return to healthier customer acquisition levels. We remain confident in RexMD's long-term growth trajectory, especially as we continue to broaden our offerings into hormone replacement therapy, personalized compounded treatments for ED and hair loss as well as additional men's health categories.

76.     Defendant Benathen also commented on the challenges to the RexMD business

during the 2Q 2025 Earnings Call, stating:

As Justin noted, our long-term financial outlook remains strong. Weight management, though experiencing some impact from higher refund rates from patients without coverage or for whom discounted cash pay pricing is still inaccessible, performed ahead of guidance plan in the second quarter.

New subscribers for weight management continued at strong levels and regularly exceeded 400 new patient sign-ups per day. WorkSimpli maintained its strong bottom line performance with quarterly adjusted EBITDA of nearly $3.7 million on a stand-alone basis. *Our quarterly results were mostly impacted by temporary performance challenges impacting our RexMD business, which are largely behind us.*

77.    During the question-and-answer portion of the 2Q 2025 Earnings Call, an analyst asked for more details about RexMD's customer acquisition costs. Defendant Schreiber responded:

> [. . .] I'll just add, like remember, we [had an enormous transition], right, this past quarter with the weight management business, which just really required a lot of energy from almost everybody in the organization. And some of the -- we did see -- we obviously saw these changes [in the competitive environment], but some of it was just think we took our eye off the ball for a little bit, and it's -- we should have gotten this thing back online a little quicker, and we didn't. But again, as we try to -- as we communicated in the -- on the call earlier, like we feel really good about where the business is. There's a lot of exciting kind of new product opportunities for RexMD and we really want to communicate that this isn't something that we're going to -- we think we -- people should be concerned about going forward.

78.    The question-and-answer portion of the 2Q 2025 Earnings Call also included the following exchange between an analyst and Defendant Benathen regarding RexMD's challenges impact on the updated guidance:

> Analyst: Just kind of as a follow-up to the last question. I just want to make sure I fully understand it. So the full year guide down, ***that's totally related to the dynamics faced with the RexMD business despite the fact that you guys now have that resolved.*** Just want to get an understanding of any impact that we would see from that in Q3 and then more recently in Q4.
>
> Benathen: ***Yes***. So the majority of it is related to that. There's a small proportion, as you mentioned, in the short term, there's some higher refund rates on the weight management patients. We're talking a few percentage points higher. That was a small proportion of the changes, which we've built into the Q2 and Q3 -- sorry, the Q3 guide.
>
> But the vast majority of it was the impact from performance in Rex in Q2 and then the downstream impact associated with less new subscribers that came in the door in Q2, retaining those people throughout the year and slightly softer sales performance than we had historically seen. Obviously, we're building back.
>
> But I'd say right now in terms of sales per day, we're at about 85% to 90% of where we've been historically, which is a big improvement over where we had been in the middle of Q2. But all of that is baked into the guidance. Now we've not assumed any potential complete rebound in Rex within that guidance. So we think we've taken a prudent point of view on that.

79.     On this news, the Company's common stock dropped approximately 45%, or $5.31 per share, decreasing from $11.84 per share at the close of trading on August 5, 2025, to $6.53 per share at the

## DAMAGES TO LIFEMD

80.     As a direct and proximate result of the Individual Defendants' conduct, LifeMD will lose and expend many millions of dollars.

81.     Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

82.     Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgments associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

83.     Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations.

84.     Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

85.     As a direct and proximate result of the Individual Defendants' conduct, LifeMD has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's

discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

86.     Plaintiff brings this action derivatively and for the benefit of LifeMD to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as directors and/or officers of LifeMD, gross mismanagement, abuse of control, waste of corporate assets, unjust enrichment, and violations of the Exchange Act.

87.     LifeMD is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

88.     Plaintiff is, and has been at all relevant times, a shareholder of LifeMD. Plaintiff will adequately and fairly represent the interests of LifeMD in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

89.     Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

90.     A pre-suit demand on the Board of LifeMD is futile and, therefore, excused.  At the time of filing of this complaint, the Board consists of the following seven individuals: Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn. Plaintiff needs only to allege demand futility as to four of the seven Directors that were on the Board at the time of the filing of this complaint.

91.     Demand is excused as to all of the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme

they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material fact, all of which renders the Director Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

92.     In complete abdication of their fiduciary duties, the Director Defendants either knowingly or recklessly caused or permitted LifeMD to issue materially false and misleading statements. Specifically, the Director Defendants caused LifeMD to issue false and misleading statements which were intended to make LifeMD appear more profitable and attractive to investors. Moreover, the Director Defendants caused the Company to fail to maintain adequate internal controls. As a result of the foregoing, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

93.     Additional reasons that demand on Defendant Schreiber is futile follow. Defendant Schreiber has served as the CEO of the Company since 2022, the Company's Executive Chairman of the Board since 2019, and as a Company director since 2018. Prior to becoming CEO, Defendant Schreiber served as the Company's President from 2018 to 2021. Thus, as the Company admits, Defendant Schreiber is a non-independent director. The Company provides Defendant Schreiber with his principal occupation for which he receives handsome compensation. As CEO, Defendant Schreiber is ultimately responsible for all the false and misleading statements and omissions that were made during the Relevant Period, including those he personally made in the 1Q 2025 Earnings Press Release and the 1Q 2025 Earnings Call. Additionally, Defendant Schreiber solicited the 2025 Proxy Statement, which included false and misleading statements and omissions and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself to the

Board, thereby allowing them to continue breaching their fiduciary duties to LifeMD. As the Company's highest officer he conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor internal controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. For these reasons, Defendant Schreiber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

94.    Additional reasons that demand on Defendant DiTrolio is futile follow. Defendant DiTrolio has served as a Company director since 2014. He also serves as a member of the Compensation Committee and the Nominating and Corporate Governance Committee. Defendant DiTrolio has received and continues to receive compensation for his role as a director. As the trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant DiTrolio solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself to the Board, thereby allowing them to continue breaching their fiduciary duties to LifeMD. For these reasons, Defendant DiTrolio breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

95.    Additional reasons that demand on Defendant Febbo is futile follow. Defendant Febbo has served as a Company director since 2023. On May 30, 2023, the Company and Defendant Febbo entered into a consulting services agreement, pursuant to which Defendant Febbo

agreed to provide certain investor relations and strategic business development services, in consideration of 375,000 restricted shares of common stock, which vested in quarterly installments from August 30, 2023 through November 30, 2024. Thus, as the Company admits, Defendant Febbo is a non-independent director. Additionally, as a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Febbo solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself to the Board, thereby allowing them to continue breaching their fiduciary duties to LifeMD. For these reasons, Defendant Febbo breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

96.     Additional reasons that demand on Defendant LaRovere is futile follow. Defendant LaRovere has served as a Company director since 2023. She also serves as a member of the Audit Committee. Defendant LaRovere has received and continues to receive compensation for her role as a director. As a trusted Company director, she conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duty to protect corporate assets. Moreover, Defendant LaRovere solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including herself to the Board, thereby allowing them to continue breaching their fiduciary duties to LifeMD. For these reasons, Defendant LaRovere

breached her fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon her is futile and, therefore, excused.

97.    Additional reasons that demand on Defendant MacRae is futile follow. Defendant MacRae has served as a Company director since 2024. Defendant MacRae has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant MacRae solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself to the Board, thereby allowing them to continue breaching their fiduciary duties to LifeMD. For these reasons, Defendant LaRovere breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

98.    Additional reasons that demand on Defendant Simon is futile follow. Defendant Simon has served as a Company director since 2020. He also serves as the Chairman of the Audit Committee. Defendant Simon has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Simon solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself to the Board, thereby allowing them to

continue breaching their fiduciary duties to LifeMD. For these reasons, Defendant Simon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

99.      Additional reasons that demand on Defendant Strawn is futile follow. Defendant Strawn has served as a Company director since 2011. He also serves as the Chairman of the Compensation Committee and the Nominating and Corporate Governance Committee and as a member of the Audit Committee. Defendant Simon has received and continues to receive compensation for his role as a director. As a trusted Company director, he conducted little, if any oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duty to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duty to protect corporate assets. Moreover, Defendant Strawn solicited the 2025 Proxy Statement, which contained false and misleading statements and resulted in, *inter alia*, the re-election of the Director-Defendants, including himself to the Board, thereby allowing them to continue breaching their fiduciary duties to LifeMD. For these reasons, Defendant Simon breached his fiduciary duties, faces a substantial likelihood of liability, is not independent nor disinterested, and thus demand upon him is futile and, therefore, excused

100.      Additional reasons that demand on the Board is futile follow.

101.      Defendants Simon (as Chair), LaRovere, and Strawn served as members of the Audit Committee during the Relevant Period. In violation of the Audit Committee Charter, Defendants Simon, LaRovere, and Strawn failed to adequately review and discuss the Company's earnings press releases, failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over

financial reporting, disclosure controls and procedures. Thus, Defendants Simon, LaRovere, and Strawn breached their fiduciary duties, are not disinterested, and demand is excused as to them.

102.    LifeMD has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director Defendants have not filed any lawsuits against the Individual Defendants or others who were responsible for that wrongful conduct to attempt to recover for LifeMD any part of the damages LifeMD suffered and will continue to suffer thereby. Thus, any demand upon the Director Defendants would be futile.

103.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company.  Accordingly, demand is excused as being futile.

104.    The acts complained of herein constitute violations of fiduciary duties owed by LifeMD's officers and directors, and these acts are incapable of ratification.

105.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of LifeMD. If there is a directors' and officers' liability insurance policy covering the Director Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director

Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of LifeMD, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

106.   If there is no directors' and officers' liability insurance, then the Director Defendants will not cause LifeMD to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability.  Accordingly, demand is futile in that event, as well.

107.   Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## **FIRST CLAIM**

**Against Individual Defendants for Violations of Section 14(a) of the Exchange Act**

108.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

109.   Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any

proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

110.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

111.    Under the direction and watch of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn, the 2025 Proxy Statement failed to disclose that contrary to the 2025 Proxy Statement's descriptions of the Board's and its committees' risk oversight functions, the Board and its committees were not adequately exercising these functions and were causing or permitting the Company to issue false and misleading statements.

112.    The 2025 Proxy Statement was also materially misleading because it failed to disclose that: (1) the Board and its committee's were not exercising  adequate risk judgement when raising 1Q 2025 guidance because they had not properly accounted for possible headwinds in the men's health and GLP-1 sectors; and (2) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and misleading at all relevant times.

113.    Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn knew or recklessly disregarded that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the 2025 Proxy Statement were materially false and misleading. The misrepresentations and omissions were material to shareholders in voting on the matters set forth for shareholder determination in the 2025 Proxy Statement, including but not limited to, the re-election of directors.

114.    The false and misleading elements of the 2025 Proxy Statement led Company shareholders voted to, *inter alia*: (1) re-elect of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn to the Board, thereby allowing them to continue breaching their fiduciary duties to the Company; and (2) ratify the selection of CBIZ CPAs, P.C. as the Company's independent registered public accounting firm for the fiscal year ending on December 31, 2025.

115.    The Company was damaged as a result of Defendants Schreiber, DiTrolio, Febbo, LaRovere, MacRae, Simon, and Strawn's material misrepresentations and omissions in the 2025 Proxy Statement.

116.    Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## SECOND CLAIM

### Against the Individual Defendants for Breach of Fiduciary Duties

117.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

118.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of LifeMD's business and affairs.

119.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

120.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of LifeMD.

121.    In breach of their fiduciary duties owed to LifeMD, the Individual Defendants willfully or recklessly caused the Company to make false and misleading statements and/or omissions of material fact that failed to disclose, *inter alia*, that: (1) the Individual Defendants

were reckless raising its guidance in the 1Q 2025 Earnings Press Release because they had not accounted for possible headwinds in the GLP-1 market and RexMD; (2) as a result, the heightened guidance in the 1Q 2025 Earnings Press Release was not "conservative" as stated in a subsequent earnings call; and (3) as a result, the statements made by, or caused to be made by, the Individual Defendants were materially false and/or misleading at all relevant times.

122.    The Individual Defendants further failed to correct and/or caused the Company to fail to correct the false and misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

123.    Also in breach of their fiduciary duties, the Individual Defendants failed to maintain adequate internal controls.

124.    In yet further breach of their fiduciary duties, during the Relevant Period, the Individual Defendants willfully or recklessly caused the Company to repurchase hundreds of thousands of shares of its own common stock at artificially inflated prices before the fraud was exposed.

125.    The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

126.    The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the scheme alleged herein and to prevent it from continuing to occur.

127.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

128.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, LifeMD has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

129.    Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

130.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

131.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, LifeMD.

132.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from LifeMD that was tied to the performance or artificially inflated valuation of LifeMD or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

133.    Plaintiff, as a shareholder and a representative of LifeMD, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or

valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

134.    Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Abuse of Control

135.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

136.    The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence LifeMD, for which they are legally responsible.

137.    As a direct and proximate result of the Individual Defendants' abuse of control, LifeMD has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

138.    Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## FIFTH CLAIM

### Against Individual Defendants for Gross Mismanagement

139.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

140.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of LifeMD in a manner consistent with the operations of a publicly held corporation.

141.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, LifeMD has sustained and will continue to sustain significant damages.

142.     As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

143.     Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## SIXTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

144.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

145.     The Individual Defendants caused the Company to pay the Individual Defendants excessive salaries and fees, to the detriment of the shareholders and the Company.

146.     As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused LifeMD to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

147.     In addition, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

148.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

149.     Plaintiff, on behalf of LifeMD, has no adequate remedy at law.

## SEVENTH CLAIM

### Against Defendants Schreiber and Benathen for Contribution
### Under Sections 10(b) and 21D of the Exchange Act

150.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

151.    LifeMD, Defendant Schreiber, and Defendant Benathen are named as defendants in the Securities Class Action, which assert claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder. If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to Defendants Schreiber's and Benathen's willful and/or reckless violations of their obligations as officers and/or directors of LifeMD.

152.    Defendants Schreiber and Benathen, because of their positions of control and authority as officers and/or directors of LifeMD, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of LifeMD, including the wrongful acts complained of herein and in the Securities Class Action.

153.    Accordingly, Defendants Schreiber and Benathen are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

154.    As such, LifeMD is entitled to receive all appropriate contribution or indemnification from Defendants Schreiber and Benathen.

**PRAYER FOR RELIEF**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of LifeMD, and that Plaintiff is an adequate representative of the Company;

(b)     Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to LifeMD;

(c)     Determining and awarding to LifeMD the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)     Directing LifeMD and the Individual Defendants to take all necessary actions to reform and improve LifeMD's corporate governance and internal procedures to comply with applicable laws and to protect LifeMD and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Certificate of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of LifeMD to nominate at least four candidates for election to the board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding LifeMD restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and

proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: September 19, 2025                              Respectfully Submitted,


**THE BROWN LAW FIRM, P.C.**

**/s/** *Timothy Brown*
Timothy Brown
767 Third Avenue, Suite 2501
New York, NY 10017
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

## **VERIFICATION**

I, Junji Shibata, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 19__ day of September, 2025.

Junji Shibata